**WHOLE COURT**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed. (Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008) http://www.gaappeals.us/rules/

**July 16, 2012**

# In the Court of Appeals of Georgia

A12A0225. MURRELL v. THE STATE.

BARNES, Presiding Judge.

Following the denial of his motion for new trial, Billy Edgar Murrell appeals from his convictions for child molestation, two counts of sexual battery, four counts of stalking, aggravated assault, false imprisonment, terroristic threats, and public indecency. Murrell contends that his trial counsel was ineffective, that the trial court erred in admitting similar transaction evidence, and that the evidence was insufficient to support any of his convictions except public indecency. For the reasons that follow, we reverse the terroristic threats conviction but affirm the remaining ones.

1. Murrell challenges the sufficiency of the evidence supporting his convictions for child molestation, two counts of sexual battery, four counts of stalking, aggravated assault, false imprisonment, and terroristic threats. When a criminal

defendant challenges the sufficiency of the evidence supporting his conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Citation omitted; emphasis in original.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979). It is the duty of the jury, not this Court, to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the evidence. Id. "As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld." (Citation and punctuation omitted.) *Miller v. State*, 273 Ga. 831, 832 (546 SE2d 524) (2001).

So viewed, the record reveals that during the summer of 2002, local police received reports of several incidents involving Murrell. Victim R. C. testified that she had met Murrell during the summer of 2002, and they initially had a friendly relationship but not a romantic one. It soon became apparent that Murrell was following her, because he would show up unexpectedly at different places where she was present. She recounted an instance when Murrell followed her to the library and took photographs of her, and another when he showed up at a grocery store and

2

would not let her go in until she agreed to talk with him. Murrell then followed her into the store and observed her as she shopped.

Later that summer, Murrell approached R. C. while her son was swimming at Rocky Mountain beach and began yelling at her that he had been at the beach all day waiting for her. R. C. tried to gather her things to leave but Murrell carried her into the water over her protestations that she could not swim. After R. C.'s son became very upset, Murrell carried R. C. back to the beach, dumped her on the ground, took her cell phone, keys, and shoes, then left in his car.

As R. C. headed for her car with her son, a park ranger drove up and R. C. obtained his assistance. Murrell then drove up and the ranger began to talk to him. Pursuant to the ranger's direction, R. C. went to a nearby campsite and asked an investigator with the Floyd County Police Department, who was camping with his family, to come and help detain Murrell. Back at the beach parking lot, the ranger made Murrell return R. C.'s belongings and he and the investigator detained Murrell while R. C. left. Later that day, Murrell found R. C. and her son at a gas station and blocked her car with his, then began "raging" about needing to talk to someone. R. C.'s son was screaming and terrified, and Murrell finally backed up and let R. C. leave the station.

Later that summer, R. C. testified, she was staying overnight with her children at a local hotel when Murrell came into her room, held her down, and raped her, then threatened to hurt her children if she told anyone.

The investigator testified about the incident at the beach and his assistance in detaining Murrell pursuant to the ranger's request for assistance. When the investigator returned to work the next week, he received a telephone call from victim T. H., who also reported an incident involving Murrell at Rocky Mountain the previous weekend.

T. H. had met Murrell at the grocery store where he worked, and he had followed her home and shown up uninvited at her home on several occasions. Over the next few months his harassment escalated, and in August 2002, Murrell showed up at Rocky Mountain beach where T. H. was swimming with her husband and children. While T. H.'s husband was on a boat out in the lake, Murrell followed her around the beach, and when T.H. attempted to leave in her car with her children, Murrell placed his hands on her car window so she could not roll it up, dropped his swim trunks, and began to fondle himself. T. H. drove down to where her husband was, and Murrell drove off. Her husband got in his car and chased Murrell, who got away.

4

The investigator noticed that another officer was also working on a case involving Murrell, in which he had allegedly exposed himself to a woman at a local college. Later on the same day T. H. came to the station to report her encounter with Murrell at the beach, the investigator secured an arrest warrant against Murrell for stalking and a search warrant for his residence. When police executed the search warrant, they discovered numerous photographs of R. C., T. H., and other unidentified women. Later that evening, police located Murrell in his car and arrested him. His passenger, F. C., told police that Murrell had held her against her will at his home for several days and made her have sex with him.

As a result of articles about Murrell in the local newspaper identifying him as a convicted sex offender, several other victims came forward, resulting in additional charges against him. Specifically, A. B. testified that she recognized Murrell from his picture in the paper, and that in June 2002, Murrell approached her car as she was waiting for her parents at a local bank. He asked if she was having car problems and offered her a ride. He later followed her into the bank, sat down beside her, and struck up a conversation, leaving only when her parents arrived. On another occasion, she had a conversation with Murrell at the grocery store where he worked, but became frightened when he showed up later that day at the church she went to after leaving

5

the grocery store. A. B. saw a vehicle similar to Murrell's parked in front of her home on several different occasions.

K. F.'s mother also contacted police when she saw the newspaper article. In early July of 2002, she and her children were at Rocky Mountain beach when her 10-year-old daughter K. F. told her that a man had touched her private parts. The children later identified Murrell from the newspaper article as that man. K. F. told police that she and several other children were playing in the water when Murrell approached them and offered to toss them in the water. After the first time, K. F. said, she did not want to be "throwed [sic] no more because [Murrell] touched [her] private parts," and she left the water. She told her sister about the incident, and the two went to a nearby bathroom but left when Murrell followed them there.

The police contacted S. E. after discovering her restaurant name tag and photographs of her in Murrell's residence. She told police that Murrell had been her customer during the early summer of 2002, but that, after a while, he "gave [her] the creeps." She said that he was "too touchy and too feely" and would hug her and try to rub against her buttocks or chest. He had suggested taking her and her children out, and she avoided him when he came into the restaurant, asking her co-workers to wait on him instead.

6

J. L., another employee at the same restaurant, saw the articles in the newspaper and reported that she also knew Murrell from the restaurant. She said that he was a regular customer and appeared at first to be "a very nice gentleman, [and] real friendly." J. L. testified that on July 21, 2002, Murrell gave her a ride home and forced his way into her house. He forcibly kissed her, pinned her against the counter, pulled her shirt down, and "suck[ed] her left breast." He was "trying to get his hands in [her] pants" when he heard a car pull in nearby and left, after telling her that she would be sorry if she told anyone what happened.

On July 29, 2002, D. B. was running on the track around the lake at a local college. Murrell approached and asked her if she wanted to go fishing with him. She said no, and turned and "ran back the other way." She ran as far as she could but her usual path was closed, so she ran back and discovered that Murrell had parked his car in a way that blocked hers from exiting. As she began to run past her car to an occupied building nearby, Murrell opened his car door and "giggled," and D. B. saw that he was nude and masturbating. She continued running and Murrell drove up beside her, asking her if she wanted a ride. Another car approached and Murrell drove away, but D. B. was able to write down Murrell's license plate number. She positively identified him from a photographic lineup.

7

Following the trial, the jury found Murrell guilty of one count each of child molestation (K. F.), aggravated assault (J. L.), false imprisonment (R. C.), terroristic threats (R. C.), public indecency (D. B.), two counts of sexual battery (S. E. and J. L.), and four counts of stalking (J. L., R. C., T. H., and A. B.). It acquitted him of two counts of rape, four counts of stalking, and one count of sexual battery.

Murrell does not contest the public indecency conviction, but contends that the evidence was insufficient to support the other convictions. He argues that the State failed to show beyond a reasonable doubt that he was not merely playing with K. F., or that the aggravated assault against J. L. was more than a casual advance that she misconstrued. He also contends that the evidence was insufficient to support his convictions for terroristic threats and false imprisonment of R. C. He argues that, in light of his acquittal for the rape of R. C., it follows that he did not commit the other acts – terroristic threats and false imprisonment– that allegedly happened on the same day.

This Court cannot weigh conflicting evidence or determine the credibility of the witnesses. "As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld." (Citations and punctuation omitted.) *Hash v. State*, 226 Ga.

8

App. 643 (487 SE2d 452) (1997). Considering the evidence in the light most favorable to the jury's verdict, sufficient evidence was presented to authorize the jury to find Murrell guilty of child molestation by touching the vagina of K. F. as alleged in the indictment, under the standard set forth in *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

Regarding the aggravated assault, Murrell was indicted for the offense of assaulting J. L. "with the intent to rape."[1] J. L. testified that Murrell forced his way into her house, kissed her against her will, and attempted to pull her pants down, stopping only when he heard another car drive up. "The crime of aggravated assault with intent to rape is complete when there is a substantial step toward a battery of the victim, i.e., an assault, coupled with intent to rape." (Citation and punctuation omitted.) *Butler v. State*, 194 Ga. App. 895, 897 (2) (392 SE2d 324) (1990). As noted before, it was for the jury to assess the witnesses' credibility, and based on the evidence in this case, the jury was authorized to conclude that Murrell intended to rape the victim.

---

[1] "A person commits the offense of aggravated assault when he or she assaults[] [w]ith intent to murder, to rape, or to rob." OCGA § 16-5-21 (a) (1).

9

Murrell challenges the terroristic threat and false imprisonment convictions stemming from the incident between him and R. C. at a hotel. The jury acquitted Murrell of rape, but convicted him of terroristic threats, OCGA § 16-11-37, and false imprisonment, OCGA § 16-5-41, arising from that incident.

We note first that although Murrell maintains the convictions cannot stand because he was acquitted of rape, even if the acquittal was inconsistent with the convictions, the inconsistency cannot be used as an avenue to challenge the convictions because the "inconsistent verdict rule" has been abolished in this State. *Milam v. State,* 255 Ga. 560, 562 (2) 341 SE2d 216 (1986).

Regarding the terroristic threats charge involving R. C., R. C. testified that she was sleeping on the floor of the hotel room at the foot of one of the beds in which her children were sleeping. Murrell entered the room, lay on top of her, "put his hand over [her] mouth and turned [her] head to the side so he could get to [her] ear." She testified that he told her that if she screamed or was loud he would hurt or kill her children, after which Murrell had forcible intercourse with her, leaving when her daughter woke up.

Murrell was charged with threatening "to commit a crime of violence against [R. C.]" with the intent to terrorize.

A person commits the offense of a terroristic threat when he or she threatens to commit any crime of violence with the purpose of terrorizing another. The crime of making terroristic threats focuses solely on the conduct of the accused and is completed when the threat is communicated to the victim with the intent to terrorize.

(Citations and punctuation omitted.) *Clement v. State*, 309 Ga. App. 376, 379 (1) (710 SE2d 590) (2011). However, no person shall be convicted of the offense of terroristic threats based on the uncorroborated testimony of the person to whom the threat was communicated. OCGA § 16-11-37 (a). While only slight evidence may be sufficient for corroboration, *Boone v. State*, 155 Ga. App. 937, 939 (1) (274 SE2d 49) (1980); *Wilson v. State*, 291 Ga. App. 263, 264 (1) (661 SE2d 634) (2008), in this case R. C.'s testimony is completely uncorroborated.

Murrell told R. C. that if she made any noise during intercourse he would "hurt or kill" the children. While the dissent correctly notes that Murrell was involved in crimes against other women during this period, the corroboration conduct as to the terroristic threats, although slight, *must be "*corroboration of the circumstances during which [the] terroristic threat [was] uttered." *In the Interest of C. S. G.*, 241 Ga. App. 37, 38 (1) (525 SE2d 106) (1999).

In *Scott v. State*, 225 Ga. App. 729 (484 SE2d 780) (1997), we determined that there was sufficient corroboration of terroristic threats based on the laceration the victim received when Scott stabbed her, the victim's testimony, "*as well as* the testimony of a witness who observed [the victim] immediately following the incident" and saw that she was nearly hysterical. Id. at 732 (3). In *Martin v. State*, 219 Ga. App. 277, 283 (10) (464 SE2d 872) (1995), the victim's testimony was corroborated by several witnesses who testified that after the incident the victim was "frightened," "nervous and scared," "literally terrified," "very afraid," and "scared to death." In *Sprayberry v. State*, 241 Ga. App. 501, 503-504 (3) (527 SE2d 224) (1999), testimony from a witness that when the victim "banged" on his door and asked to use his phone, she was "terrified," "really agitated," and "nervous almost to the point of shaking," was sufficient corroboration of the appellant's threat to kill the victim.

Even though J. L. testified that Murrell said that she would be "sorry" if she told anyone about Murrell's attack, we have held that similar *corroborated* threats against one victim could be used to corroborate threats against another victim. *Ellis v. State*, 176 Ga. App. 384, 386-87 (3) (336 SE2d 281) (1985). In *Ellis*, the appellant was charged with two counts of terroristic threats, one which was corroborated by the victim's daughter and other witnesses who overheard the defendant threaten to "kill

12

the victim and to kill "all white men." ( Punctuation omitted.) Id. at 386. The second count was based on appellant's threat against a police officer who arrested Ellis to "kill the officer and to kill all white police officers." Id at 387. The second threat occurred in the patrol vehicle and was only witnessed by the officer. Id at 387. We held that the officer's testimony was sufficiently corroborated because the previous *corroborated* threat was similar and tended to prove that the incident involving the officer had occurred. Id.

In this case, however, J. L.'s threats were not corroborated by any other witnesses, and thus not sufficient to corroborate the uncorroborated threats against R. C. Moreover, although there were several witnesses present at the hotel with R. C., there is no corroborating evidence, even slight, "that the incident occurred as alleged." (Citations and punctuation omitted.) *Scott v. State*, 225 Ga. App. at 732 (3). Slight corroboration *of the circumstances during which a terroristic threat is uttered* is . . . necessary to satisfy OCGA § 16-11-37 (a)'s requirement." (Citation omitted and emphasis supplied.) *In the Interest of C. S. G.*, 241 Ga. App. at 38 (1); *Drew v. State*, 256 Ga. App. 391, 393 (1) (568 SE2d 506) (2002) (even though victim did not hear threat, her testimony about Drew's violent behavior towards her was sufficient to corroborate the police officer's testimony that he heard Drew threaten the victim).

13

Thus, in this case, as Murrell's threat to "hurt or kill" the victim's children was uncorroborated, the evidence was insufficient to sustain his conviction for the offense of terroristic threats. Accordingly, we must reverse that conviction. See *Hanvey v. State*, 186 Ga. App. 690 (1) (368 SE2d 357) (1988).

Murrell also contends that insufficient evidence supports his false imprisonment conviction. The indictment charged that Murrell did "unlawfully. . . arrest, confine and detain [R. C.] without legal authority." All that is required to prove false imprisonment "is there be an arrest, confinement or detention of the person, without legal authority, which violates the person's personal liberty (i.e., against his or her will)." (Citation and punctuation omitted.) *Armstrong v. State*, 244 Ga. App. 871, 872 (1) (537 SE2d 147) (2000). See also OCGA § 16-5-41 (a). Here, evidence was presented that Murrell came into R. C.'s room uninvited, put his hand across her mouth, and lay on top of her, confining her movement and rendering her unable to resist. This evidence is sufficient to sustain Murrell's conviction for false imprisonment. *Rehberger v. State*, 235 Ga. App. 827, 827-828 (1) (510 SE2d 594) (1998); *Herrin v. State*, 229 Ga. App. 260, 263 (3) (493 SE2d 634) (1997) (OCGA § 16-5-41 (a) does not on its face require that imprisonment be for specific length of time).

2. Murrell also contends that his trial counsel was ineffective for failing to object and move for a mistrial when the State failed to present at trial evidence of the similar transaction for which it had given notice; for failing to keep out hearsay evidence of a separate allegation of child molestation; for failing to move for a change of venue; and for failing to move for a mistrial when the jury was given an un-redacted transcript containing allegations of a crime for which he had not been indicted.

> To establish ineffective assistance, [Murrell] must show both that his trial counsel's performance was deficient and that this deficiency prejudiced his defense. [Murrell] must establish both elements; if we determine that one element is missing we need not consider whether the defendant has established the other element.

*Hinton v. State*, 290 Ga. App. 479, 481 (2) (659 SE2d 841) (2008).

a. The State filed notice of its intent to present evidence that Murrell had previously pled guilty to kidnapping, rape, and aggravated sodomy. Following a hearing, the trial court ruled that the evidence was admissible. At the end of the State's case-in-chief, the State informed the trial court that its similar transaction witness had been hospitalized and would not be available to testify, so it would not be presenting the similar transaction evidence. Murrell contends that his trial counsel

15

was ineffective for failing to move for a mistrial at that point, because his trial strategy "relied heavily" on the similar transaction evidence being presented at trial.

At the motion for new trial hearing, trial counsel testified that even if he had known that the similar transaction was not coming in, he probably would not have changed his trial strategy. He testified that he "probably would have told the jury about [the similar transaction] anyway" because "our theory was that most of these allegations were made by witnesses who were not credible, who had made these reports only after learning that there was a convicted sex offender living in their community."

We must measure the trial counsel's performance under the circumstances existing at trial. *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985). Although another trial counsel might have pursued a different strategy or tactic, the existence of an alternative course of action does not constitute ineffective assistance of counsel. *Heard v. State*, 177 Ga. App. 802, 804 (5) (341 SE2d 459) (1986). The constitutional right to assistance of counsel means "not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance." (Citation and punctuation omitted.) *Alderman v. State*, 241 Ga. 496, 511 (8) (246 SE2d 642) (1978). Considering the

16

totality of the circumstances in Murrell's trial, he has not met his burden under *Strickland v. Washington* of showing that his counsel's performance was deficient for failing to move for a mistrial when the State was unable to introduce its similar transaction evidence.

b. Murrell also asserts that counsel should have filed a motion for a change of venue because of the publicity surrounding his arrest. To support a motion for a change of venue, Murrell had the burden of demonstrating "(1) that the trial's setting was inherently prejudicial or (2) that the jury selection process revealed actual prejudice to a degree that rendered a fair trial impossible. [Cit.]" *Brady v. State*, 270 Ga. 574, 575 (3) (513 SE2d 199) (1999).

At the hearing on the motion for new trial, Murrell's trial attorney testified that he did not recall an overwhelming amount of media coverage on the case, which came to trial approximately two years after the initial publicity. Further, he testified that his trial strategy was to use the publicity surrounding the case to demonstrate that some of the victims were not reliable and that their calls to police were generated by the newspaper articles rather than made contemporaneously when the incidents occurred. Trial counsel testified that he could not recall the specific responses of the jurors to

questions about pretrial publicity, but that prejudice in the pool must have been limited because they were able to satisfactorily seat a jury.

Other than showing that six stories ran in the local newspaper between August 22, 2002 and October 19, 2002, Murrell did not present any evidence at the motion hearing to show that the jury could have been unfairly tainted or biased in the context of a trial that occurred in May 2004. "Under those circumstances, there being no evidence the trial's setting was inherently prejudicial or the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible, [Murrell] has not shown the failure to seek a change of venue constituted ineffective assistance of counsel." (Citation omitted.) *Williams v. State*, 277 Ga. 853, 858-859 (6) (d) (596 SE2d 597) (2004). Moreover, trial counsel's assessment that the venue was not tainted fell within reasonable trial strategy and tactics and do not amount to ineffective assistance of counsel. *Hazelrigs v. State*, 255 Ga. App. 784, 786 (2) (567 SE2d 79) (2002).

c. Murrell further contends that trial counsel was ineffective for failing to keep out harmful hearsay about another allegation of child molestation contained in the recorded interview with K. F. that was played to the jury. During the recorded interview, K. F. told the investigator that "Ashley" told her that Murrell had touched

her in the same way he touched K. F. Murrell asserts that the hearsay violated his Sixth Amendment right to confront and cross-examine the witnesses against him, and his trial counsel's failure to object constituted error.

This claim, however, was not raised in the motion for new trial as amended or at the hearing in the matter. Thus, this allegations of ineffectiveness is deemed waived because a defendant is obligated to raise all allegations of ineffectiveness of counsel at the earliest practicable moment. *Hayes v. State*, 262 Ga. 881, 882 (2) (426 SE2d 886) (1993).

d. Murrell also contends that trial counsel was ineffective for failing to request that the trial court ask the jurors if they had read ahead in their copy of the transcript of an interview being played in open court. During the trial, the State played the tape of a police interview with victim R. C., and the jury was given a transcript of the interview to read along as the tape played. While reading ahead, trial counsel discovered an un-redacted hearsay statement R. C. made concerning her cousin's comments about Murrell. The cousin was not a witness at trial. Trial counsel raised an objection, the trial court sustained the objection, and the bailiff collected the jurors' transcripts.

At the motion for new trial hearing, trial counsel testified that he did not ask for a curative instruction because he did not want to bring unnecessary attention to the statement, and that in his experience, jurors follow along "word for word" with the audiotape and the transcript. He further testified that he believed that he had discovered the inadmissible hearsay before it was exposed to the jury.

As stated earlier,"[t]rial strategy and tactics do not equate with ineffective assistance of counsel." (Punctuation and footnote omitted.) *Caylor v. State*, 255 Ga. App. 362, 364 (1) (566 SE2d 33) (2002).

> When a defendant's complaint relates to tactical judgments made by trial counsel, in the absence of a showing, and there is none in the present case, that the trial counsel's loyalty, integrity or best use of his ability is questioned, a new trial will not be granted on the ground that the defendant was not afforded competent representation.

(Citation and punctuation omitted.) *Sledge v. State*, 312 Ga. App. 97, 103-104 (2) (b) (717 SE2d 682) (2011). Here, trial counsel's decision not to seek a mistrial on this ground was a tactical decision and was not ineffective.

3. Murrell also asserts as error the trial court's jury instruction regarding similar transaction evidence because the State did not introduce such evidence at trial and the instruction "inappropriately drew attention to the similar transaction." While

20

absent the State's introduction of evidence regarding the similar transaction the charge was not relevant or applicable, reviewing the charge as a whole, as we must, we conclude that the error was harmless. *Stansell v. State*, 270 Ga. 147, 150-151 (4) (510 SE2d 292) (1998). The trial court adequately and appropriately informed the jury of the charges against Murrell, of his presumption of innocence, of the State's burden of proof, and of its duty to acquit if it did not find him guilty beyond a reasonable doubt. Id.

*Judgment affirmed in part and reversed in part. Mikell, P .J., and Miller, J., concur. Adams, J., concurs in judgment only. Doyle, P. J., Blackwell and McFadden, JJ., concur in part and dissent in part.*

A12A0225. MURRELL v. THE STATE.

McFADDEN, Judge, concurring in part and dissenting in part.

I respectfully dissent from the portion of division 1 that reverses Murell's conviction for terroristic threats. I concur fully in the remainder of the majority opinion.

I would hold that, "[t]he victim's testimony in this regard was sufficiently corroborated by the evidence concerning the events which transpired immediately before and after the appellant made the asserted threats." *Steele v. State*, 196 Ga. App. 330, 331 (3) (396 SE2d 4) (1990). "[C]orroborating conduct includes the defendant's commission of similar transactions which were clearly interwoven and linked (connected) with the facts of the crime charged." (Citations omitted.) *Alatise v. State*,

__ Ga. __, __ (5) (__ SE2d __) (Case number S12A0024, decided June 18, 2012). Here "the evidence of a clear crime spree committed by [Murrell] both before and after the [terroristic threat made to R. C.] corroborated [R. C.'s] testimony." Id. And that evidence "showed a clear modus operandi" of targeting and isolating women. Id His effort to discourage R. C. from calling for help was consequently sufficiently "interwoven and linked" with the rest of his crime spree for his other crimes to provide the slight corroboration necessary to sustain his conviction for terroristic threats.

I note that *Alatise* involved corroboration of a co-defendant's testimony and that we have found no cases in which similar transactions involving other victims have been recognized as the corroboration necessary to sustain a conviction for terroristic threats. Nevertheless, "[i]n order to interpret [the corroboration requirement of the terroristic threats statute], reference can be made to other corroboration requirements in Georgia law." Robert E. Cleary, Jr., Kurtz Criminal Offenses and Defenses in Georgia, Terroristic Threats and Acts, p. 1752 (2011 ed.).

In that regard, as the majority notes, Murrell also threatened another of his victims, J. L., if she told anyone about his attack. While the majority attempts to distinguish the instant case from *Ellis v. State*, 176 Ga. App. 384 (336 SE2d 281)

2

(1985), that case sets forth the rule of law that controls this case. "[T]he corroboration requirement of OCGA § 16-11-37 has been analogized to the corroboration that was formerly required in rape cases and that is still required in statutory rape cases. In crimes involving sexual offenses, evidence of similar previous transactions is admissible to *corroborate* the testimony of the victim as to the act charged." (Citations and punctuation omitted; emphasis in original). Id at 387 (3). Thus, J. L.'s testimony of a similar threat by Murrell during an assault was sufficient to corroborate R. C.'s testimony as to Murrell's terroristic threat during his assault of her.

Indeed, "[s]light circumstances may be sufficient for corroboration and the question of corroboration is one solely for the jury. If there is any evidence of corroboration, this court will not go behind the jury verdict and pass on its probative value." (Citations and punctuation omitted.) Id. at 386 (3). Because there is some evidence corroborating the victim's testimony, Murrell's terroristic threats conviction should be affirmed.

I am authorized to state that Presiding Judge Doyle and Judge Blackwell join in this dissent.